BROWNSTEIN HYATT FARBER SCHRECK LLP
James J. Pisanelli (NV SBN 4027)
300 South Fourth Street, Suite 1200
Las Vegas, Nevada 89101
Telephone: (702) 382-2101

IRELL & MANELLA LLP
Marc S. Maister (CA SBN 155980)
Harry J. Schulz, III (CA SBN 205625)
David R. Kaplan (CA SBN 230144)
(All admitted *pro hac vice*)
840 Newport Center Drive, Suite 400
Newport Beach, California 92660-6324
Telephone: (949) 760-0991

Attorneys for Plaintiff
Pinnacle Entertainment, Inc.

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

|  |  |
|---|---|
| PINNACLE ENTERTAINMENT, INC., a Delaware corporation,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>RSUI INDEMNITY COMPANY, a New Hampshire corporation,<br><br>　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 2:06-cv-00935-BES-PAL<br><br>**PINNACLE ENTERTAINMENT, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ISSUES REGARDING BUSINESS INTERRUPTION COVERAGE, AND MEMORANDUM IN SUPPORT THEREOF** |

1937891

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ..................................................................................1

II.  BACKGROUND ...................................................................................3

   A.   The parties. .................................................................................3

   B.   The policies. ...............................................................................4

   C.   The loss. .....................................................................................5

   D.   The sale of the damaged property and Pinnacle's
        designation of the St. Louis County project as a
        replacement facility. ...................................................................5

   E.   RSUI takes the position that the Asset Sale and replacement
        cut off valuable policy benefits. .................................................8

III. SUMMARY JUDGMENT STANDARD .................................................9

IV.  GOVERNING LAW ............................................................................9

V.   RELEVANT INSURANCE LAW .......................................................11

VI.  PINNACLE'S SALE OF THE CASINO MAGIC PROPERTY
     DOES NOT LIMIT ITS BUSINESS INTERRUPTION
     RECOVERY ........................................................................................12

   A.   The sale of the Casino Magic property did not terminate
        Pinnacle's insurable interest. ...................................................13

   B.   The RSUI policy does not limit Pinnacle's business
        interruption insurance to the period prior to the Casino
        Magic Asset Sale. .....................................................................15

VII. PINNACLE'S REPLACEMENT OF ITS CASINO MAGIC
     BUSINESS IN ST. LOUIS DOES NOT BAR RECOVERY OF
     START-UP COSTS .............................................................................18

   A.   The Primary Policy provides the insured with the option of
        replacement. ..............................................................................19

   B.   The designation of the St. Louis project as a replacement
        does not terminate coverage for start-up costs. ......................20

   C.   Pinnacle's start-up costs would be recoverable even if
        Biloxi had been closed and not replaced. ...............................22

VIII. CONCLUSION ...................................................................................24

1

## TABLE OF AUTHORITIES

2
Page(s)

3
### Cases

4
*Abogados v. AT&T, Inc.*,
5      223 F.3d 932 (9th Cir. 2000)........................................................................10

*Arley v. Liberty Mut. Fire Ins. Co.*,
6      80 Nev. 5, 388 P.2d 576 (1964) ...............................................................16

7
*B A Properties, Inc. v. Aetna Casualty & Surety Co.*,
     273 F.Supp.2d 673 (D.V.I. 2003)...............................13, 14, 16, 17
8
*Beautytuft, Inc. v. Factory Ins. Ass'n.*,
9      431 F.2d 1122 (6th Cir. 1970)....................................................................17

10
*Blanchette v. York. Mut. Ins. Co.*,
     455 A.2d 426 (Me. 1983) ...........................................................................20
11
*Buente v. Allstate Ins. Co.*,
12      422 F.Supp.2d 690 (S.D.Miss. 2006) ...............................................10

13
*Coblentz v. Hotel Employees & Restaurant Employees Union Welfare Fund*,
14      112 Nev. 1161, 925 P.2d 496 (1996) .............................................10

15
*Conway v. Farmers Home Mut. Ins. Co.*,
     31 Cal.Rptr.2d 883 (Cal.App. 1994) ...........................................19
16
*DiLeo v. United States Fidelity & Guaranty Co.*,
17      248 N.E.2d 669 (Ill.App. 1969) .............................................13, 22, 23

18
*Ebert v. Grain Dealers Mut. Ins. Co.*,
     303 N.E.2d 693 (Ind.App. 1973)................................................13
19
*Georgia-Pacific Corp. v. Allianz Ins. Co.*,
20      977 F.2d 459 (8th Cir. 1992)........................................................16, 17

21
*Gossett v. Farmers Ins. Co. of Washington*,
     948 P.2d 1264 (Wa. 1997)..........................................................14
22
*Home Ins. Co. of New York v. Dalis*,
23      141 S.E.2d 721 (Va. 1965) ...........................................................14

24
*In re Cosmetics Plus Group, Ltd.*,
     379 B.R. 464 (Bkrtcy.S.D.N.Y. 2007) .........................................16
25
*Klaxton Co. v. Stentor Elec. Mfg. Co.*,
26      313 U.S. 487 (1941) ....................................................................10

27
*Mora v. Chem-tronics, Inc.*,
     16 F. Supp. 2d 1192 (S.D. Cal. 1998) .........................................9
28

Page(s)

*National Union Fire Ins. Co. v. Reno's Executive Air, Inc.,*
   100 Nev. 360, 682 P.2d 1380 (1984) ......................................... 11, 12, 16, 21

*Nevada VTN v. Gen. Ins. Co. of America,*
   834 F.2d 770 (9th Cir. 1987)....................................................... 9, 11

*Northwestern States Portland Cem. Co. v. Hartford F.I. Co.,*
   360 F.2d 531 (8th Cir. 1966)...................................................... 12

*Pinnacle Entertainment, Inc. v. Allianz Global Risks US Insurance Co.,*
   *et al.*, 2:06-CV-00935-BES-PAL (Order of March 26, 2008) ...................... 9

*Rube v. Pacific Ins. Co. of N.Y.,*
   131 So.2d 240 (La.Ct.App.1961) ............................................... 13

*S & S Tobacco & Candy Co. v. Greater N.Y. Mut. Ins. Co.,*
   617 A.2d 1388 (Conn. 1992)...................................................... 19

*Sotirakis v. U.S.A.A.,*
   106 Nev. 123, 787 P.2d 788 (1990) ............................................ 10, 11

*Stanford Ranch v. Maryland Casualty Co.,*
   89 F.3d 618 (9th Cir. 1996)....................................................... 9

*Travelers Ins. Co. v. Providence Washington Ins. Group,*
   142 A.D.2d 968 (N.Y.App.Div. 1988)....................................... 14

*Universal Underwriters Group, Inc. v. State Farm Fire and Cas. Co.,*
   931 So.2d 617 (Miss.App. 2005) ............................................... 14

**Statutes**

Fla. Stat. ch. 627.405 ................................................................. 13

Ala.Code § 27-14-4 ................................................................... 13

Alaska Stat. § 21.42.030 ............................................................ 13

Ark.Code Ann. § 23-79-104 ....................................................... 13

Del.Code Ann. tit. 18 § 2706 ..................................................... 13

Ga.Code Ann. § 33-24-4............................................................ 13

Idaho Code § 41-1806 ............................................................... 13

Jackson, Miss. Ins. Law and Prac. § 4:1 (up. June 2008)................. 14

Ky.Rev.Stat. Ann. § 304.14-060 ................................................ 13

Md.Code Ann. Ins. § 12- 301 ..................................................... 13

Page(s)

Me.Rev.Stat. Ann. tit. 24-A § 2406 .......................................................... 13

Mont.Code Ann. § 33-15-205 .................................................................... 13

N.M. Stat. Ann. § 59A-18-6 ...................................................................... 13

Nev.Rev.Stat. § 687B.060 .......................................................................... 13

**<u>Other Authorities</u>**

Fed. R. Civ. P. 56(a), (d) .............................................................................. 9

**<u>Rules</u>**

Restatement (Second) Conflict of Laws, § 188(2) ............................. 10, 11

44 Am. Jur. 2d Insurance § 1534 (up. May 2008) .................................... 17

4 Appleman, Insurance Law and Practice § 2329 (1969) ........................ 12

3 Couch on Ins. § 41.15 ............................................................................. 14

12 Couch on Ins. § 178.66 .................................................................. 13, 18

Plaintiff Pinnacle Entertainment, Inc. ("Pinnacle") moves for partial summary judgment against defendant RSUI Indemnity Company ("RSUI") on the two following business interruption coverage issues:

1.     The post-loss sale of Pinnacle's devastated Casino Magic building and associated real estate in Biloxi, Mississippi, does not end the period of recovery for which RSUI is liable for business interruption; and

2.     The replacement by Pinnacle of its devastated Casino Magic business, previously located in Biloxi, Mississippi, with a similar not-yet-constructed enterprise in St. Louis, Missouri, does not eliminate RSUI's liability to Pinnacle for start-up costs under RSUI's business interruption coverage.

## I.     INTRODUCTION

On August 29, 2005, Hurricane Katrina devastated Pinnacle's Casino Magic land-based hotel and its associated floating casino barge in Biloxi, Mississippi. Months after the loss, Pinnacle, in accordance with its insuring agreements, sold the remains of its Biloxi site and replaced its decimated Casino Magic business with a proposed facility in St. Louis, Missouri.  RSUI now argues that the sale of the land and building in Biloxi cut off Pinnacle's ability, as of the date of sale, to recover the full contract measure of its business interruption loss.  And even though it stipulated that the St. Louis site is a replacement for Casino Magic for calculation of the construction costs relating to Pinnacle's property damage loss, RSUI also argues that the replacement in St. Louis cuts off Pinnacle's right to the expenses that would have been incurred in Biloxi in connection with the reopening of the business there (referred to as "start-up costs"), and which will be incurred in ultimately starting up the replacement facility in St. Louis.  RSUI is wrong.

Business interruption loss, like property loss, is an insurable loss if the insured owned the business at the time of its damage or destruction.  Nothing in the policy language applicable here (found in the primary policy and incorporated by the RSUI

1   policy) contradicts this widely held rule.  Moreover, as the primary policy confirms,
2   business interruption loss (calculated based on historical earnings and earnings trends
3   with due account for expenses), like damage from fire or other physical property loss,
4   accrues and is generally calculable at the moment of injury.  Thus, like physical loss,
5   neither the permanent closure of a damaged or destroyed business, nor the sale of the
6   property, is relevant to the calculation of business interruption loss.  What is relevant
7   is the period of time that a reasonable insured, using due diligence, would need to
8   repair, rebuild, or replace the damaged property.  Thus, if with due diligence it would
9   have taken "x" months or years to rebuild Casino Magic at its original site in Biloxi,
10  the sale of the site neither shortens nor extends this period for the purpose of
11  calculating business interruption loss.

12          Nor does the agreed-to replacement of the Biloxi facility with one in St. Louis
13  affect the recovery of start-up expenses that Pinnacle would have incurred at Biloxi
14  (and will incur at St. Louis).  There is no dispute that had Pinnacle rebuilt in Biloxi,
15  and restarted its business there, these start-up expenses would have been recoverable,
16  since they are a required cost as of the moment of destruction in order to restart the
17  business and regain its income stream, the very income stream that business
18  interruption insures.  (Start-up costs include, among other things, employee salaries
19  for training and otherwise readying the facility for a successful opening, and
20  marketing and advertising with respect to the opening.)  The policy permits the
21  insured the option of replacing the facility anywhere in the United States, and nothing
22  in the policy suggests that there is any penalty associated with exercising that
23  replacement option.  Just as Biloxi would have required start-up expenses, so will the
24  replacement facility in St. Louis.  Accordingly, the start-up costs that would have
25  been incurred in Biloxi (and no more) are recoverable to the extent that they will be
26  eventually incurred at the replacement facility in St. Louis.

27

28

1   The issues raised here turn on the law of insurance and the language of the

2   applicable policies.  These are pure questions of law.  Pinnacle is entitled to partial

3   summary judgment on these two issues.

### II.   BACKGROUND

4

**A.   The parties.**

5

6   Pinnacle is a Nevada-based owner, operator and developer of hotels and

7   casinos in the United States and abroad.  Declaration of Arthur I. Goldberg

8   ("Goldberg Decl.") ¶ 2.  At the time of the events relevant here, Pinnacle owned and

9   operated a floating casino barge, and associated land-based hotel and real estate, at

10  Biloxi Bay, Mississippi ("Casino Magic").  *Id.*  At the time of the loss that is the

11  subject of this action, Pinnacle had $400 million of "all risk" insurance, including

12  coverage for business interruption.  *Id.*, ¶ 4.

13  RSUI is an excess insurance carrier that issued three policies to Pinnacle, two

14  of which are at issue here.  The first, Policy No. NHD411008, provided coverage, per

15  occurrence, of $50 million, as part of a $100 million layer in excess of underlying

16  coverage of $150 million.  Declaration of David R. Kaplan ("Kaplan Decl."), Ex. 1,

17  p. 5.  The second, Policy No. NHD411018, provided coverage, per occurrence, of

18  $150 million excess underlying coverage of $250 million.  *Id.*, Ex. 2, p. 31.  With

19  respect to its insurance coverage obligations under these two policies, RSUI has paid

20  $2,017,908.32 to Pinnacle, but has failed and refused to pay any additional amounts.

21  Goldberg Decl., ¶ 10; *see* Kaplan Decl., Ex. 4.  RSUI is the only carrier that

22  continues to refuse to satisfy its obligations with respect to the events giving rise to

23  this litigation.[1]  Goldberg Decl., ¶ 10.

24

25

26

---

27   [1] After the Court's prior summary judgment order in this case, Allianz Global

28  Risks US Insurance Company, the only other carrier withholding payment, settled
    with Pinnacle for its full policy limits.  Goldberg Decl. ¶ 10.

**B.    The policies.**

RSUI's excess policies "follow form" to Pinnacle's primary insurance policy (the "Primary Policy").  Kaplan Decl., Ex. 1, p. 6, ¶ 5 ("This Policy is subject to the same ... terms and conditions ... as are contained in or may be added to the policy[] of the primary insurer[]"); Ex. 2, p. 32, ¶ 5 (same).  The Primary Policy was issued by Westport Insurance Corporation ("Westport").  Goldberg Decl., ¶ 4; Kaplan Decl., Ex. 3.

Under the heading "Time Element Section," the Primary Policy provides coverage for, *inter alia*, business interruption loss resulting from covered property damage.  Kaplan Decl., Ex. 3, p. 85.

> [T]his Policy covers against the loss resulting only from
> necessary interruption of business ....  [¶ ] RECOVERY in
> the event of loss hereunder shall be the ACTUAL LOSS
> SUSTAINED by the Insured directly resulting from such
> interruption of business ... for only such length of time as
> would be required with the exercise of due diligence ... **to**
> **rebuild, repair or replace such described property** as has
> been damaged or destroyed, commencing with the date of
> such damage or destruction and not limited by the date of
> expiration of this Policy.

*Id.*, p. 85, § I (capitalization in original, bold emphasis added).[2]  Under the heading "Period of Recovery," the Primary Policy repeats and confirms that the period of recovery is measured by the time it would take, with due diligence, to "rebuild, repair, or replace" the covered property.  *Id.*, p. 108 , ¶ X.  Similarly, in the section entitled "Property Valuation and Recovery," the Primary Policy provides that buildings and structures may be "replaced within two (2) years from the date of loss

---

[2] Although "recovery" and "actual loss sustained" are capitalized in the Primary Policy, these terms are not defined.

1   or damage … at another site (within the same country) ....” *Id.*, p. 79-80, §§ III &
2   III.A.

3          Although the Primary Policy provides that the business may be replaced
4   elsewhere, the amount of business interruption loss is primarily calculated based on
5   the historic operation and probable future experience of the original facility:

6                  In determining the amount of Time Element loss as insured
7                  against by this policy, due consideration should be given to
8                  experience of the business before the loss and the probable
9                  experience thereafter had no loss occurred.

10  *Id.*, p. 89, § VIII.C.[3]

11  **C.     The loss.**

12         On August 29, 2005, Hurricane Katrina struck Biloxi, Mississippi, decimating
13  Pinnacle's Casino Magic land-based hotel and its associated floating casino barge.
14  Goldberg Decl., ¶ 3.  The force of the hurricane carried the casino barge across a
15  four-lane interstate highway, depositing it onto a parking lot hundreds of feet inland.
16  *Id.* & Ex. B (post-loss photos of Casino Magic).  In addition, violent winds shredded
17  the exterior of the hotel and the casino barge, exposing the interior of both structures
18  to torrential rains that caused extensive damage.  *Id*.  This devastation resulted in a
19  total cessation of Pinnacle's business operations at the Biloxi site.  *Id.*

20  **D.     The sale of the damaged property and Pinnacle's designation of the**
21         **St. Louis County project as a replacement facility.**

22         Pinnacle provided timely notice to each of its insurers of the damages to the
23  Casino Magic property caused by Hurricane Katrina.  Kaplan Decl., Ex. 5, p. 123-24,
24  ¶ 23 (RSUI Answer, stating that "RSUI admits that Pinnacle provided timely notice
25  of the loss").  On February, 23, 2006, Pinnacle advised RSUI that it was considering

26         [3] "Time Element" is defined in the Primary Policy as "Business Interruption ...
27  and other related time interests."  Kaplan Decl., Ex. 3, p. 106, ¶ R.  As such,
    "Business Interruption" coverage is but one of the time-related coverages provided
28  under the policies.

1  not rebuilding the devastated Biloxi property, but instead designating a hotel and

2  casino, then in the early planning stages for development in St. Louis County,

3  Missouri, as a replacement.[4]  Goldberg Decl., ¶ 7; Kaplan Decl., Ex. 6.  For several

4  months thereafter, Pinnacle made repeated requests to its insurers, including RSUI, to

5  advise Pinnacle of any objections to the proposed replacement designation.  Goldberg

6  Decl., ¶ 8; *see*, *e.g.*, Kaplan Decl., Ex. 7.  Neither RSUI, nor any other insurer,

7  objected to Pinnacle's designation of the proposed St. Louis County facility as a

8  replacement for Casino Magic.  Goldberg Decl., ¶ 8.

9       Having heard no objection from its insurers, in April 2006 Pinnacle announced

10  that it had signed a non-binding letter of intent under which the Casino Magic Biloxi

11  site would be sold.  Goldberg Decl., ¶ 8 & Ex. C, p. 38.  Pinnacle continued to press

12  its insurers as to whether they objected to the contemplated sale and related St. Louis

13  replacement, noting, for example, that its "willingness to enter into the [sale] is based

14  on the insurers' agreement that the [St. Louis] County Project is a replacement

15  location under the Policy."  Kaplan Decl., Ex. 15, p. 231.  Still, no insurer objected,

16  or expressed any reservations.  On or about May 31, 2006, Pinnacle announced its

17  sale of the Casino Magic site and certain related assets to Harrah's Entertainment,

18  Inc. ("Harrah's").  Goldberg Decl., ¶ 8 & Ex. C, p. 36; *see* Kaplan Decl, Ex. 9, p. 145

19  (Recitals E & F) (describing real estate and assets being sold).  Only then, in June

20  2006, did RSUI and other insurers for the first time assert that the sale of the Biloxi

21  site would affect its recovery of business interruption loss, and that the replacement

22  of Biloxi with the St. Louis County site would eliminate Pinnacle's right to start-up

23  costs.

24

---

25      [4] The "River City Casino & Hotel" is being developed at a site overlooking the
26  Mississippi River between St. Louis County and the City of St. Louis.  Goldberg
    Decl., ¶ 9.  Like Casino Magic in Biloxi, it will be a gaming and multi-use complex
27  that will include a hotel, restaurants, an entertainment venue and other amenities.  *Id.*
28  It is expected to open in late 2009 or early 2010, pending receipt of regulatory and
    other approvals.  *Id.*

The sale of the Biloxi site to Harrah's closed on November 9, 2006 (the "Asset Sale").  Goldberg Decl., ¶ 8 & Ex. C, p. 39.  By stipulation executed on or about November 15, 2006, RSUI agreed, for the purposes of Paragraph III.A of the Primary Policy, that the St. Louis County project is a replacement for Pinnacle's damaged Biloxi property.  Kaplan Decl., Ex. 8, p. 132 (RSUI stipulation that it "agree[s] that the St. Louis County project constitutes 'another site' as that term is used in Paragraph III.A in the primary policy ....").  Paragraph III.A of the Primary Policy is primarily for the benefit of the insurer, as it permits the insurer to calculate the costs of rebuilding by the lesser of the costs incurred at the replacement site or what otherwise would have been incurred at the original site.  RSUI's stipulation explicitly reserved both of the issues addressed by this motion.  Kaplan Decl., Ex. 8, p. 132-33, ¶ 5 (stating that RSUI reserves its "arguments... that Pinnacle is not entitled to recover for any of its ... start up cost loss ... as a consequence of Pinnacle's designation of any 'replacement' location; and an argument that the closure of the proposed sale of Casino Magic Biloxi will shorten the period of indemnity for Pinnacle's claimed business interruption loss.").

The sale agreement with Harrah's explicitly recognized that Pinnacle was "relocating [its] business operations to St. Louis, Missouri, and that, among other things, Pinnacle retained ownership of its Casino Magic businesses and any potential or actual future revenues, all right, title and interest in the "Casino Magic" name and marks, as well as its insurance policies and any claims "resulting from or relating to Hurricane Katrina" (which are defined in the agreement as the "Pre-Existing Claims").  Kaplan Decl., Ex. 9, p. 145 (Recital F), p. 156 (§ 5.4.2.6), p. 162 (§ 6.7.1), p. 162-63 (§ 6.8).  Thus, the Asset Sale agreement explicitly provides that there was no assignment of Pinnacle's Hurricane Katrina claim in connection with the Asset Sale, and that Pinnacle continued to own its Casino Magic business after the sale closed.

In December 2007, one and one-half years after it was designated as the replacement site, construction began at the St. Louis County site.  Goldberg Decl., ¶ 9.

**E.**      **RSUI takes the position that the Asset Sale and replacement cut off valuable policy benefits.**

On March 26, 2008, this Court granted partial summary judgment to Pinnacle, holding that coverage existed under the defendants' policies for Pinnacle's loss from Hurricane Katrina.  [Dkt. #190]  There are two principal legal issues remaining between Pinnacle and RSUI.  The first is whether the period of recovery for which RSUI is liable for business interruption is reduced because of Pinnacle's sale of its devastated real estate and related assets in Biloxi.  Assuming that issue is resolved in Pinnacle's favor, the second issue is whether a component of business interruption coverage, start-up costs, is nevertheless excluded from coverage because of the replacement of the Biloxi business with the proposed hotel and casino in St. Louis.  Approximately $79.8 million is involved in the first issue, of which about $21.5 million is also encompassed by the second issue.  *See* Kaplan Decl., Ex. 10, p. 209, 213.  The exact amounts owed will not be determined by this motion.

These two legal issues are identified in the letter dated June 26, 2008, from RSUI's counsel to Pinnacle's counsel.  There, RSUI's counsel articulated "[t]he following legal issues [that] remain":

> (a)      *Start-Up Costs*:  Pinnacle did not incur any 'start-up' costs as it did not repair, rebuild or replace Casino Magic....
>
> …
>
> (c)      Business Interruption Period of Indemnity: ... [T]here is a question of when the period of indemnity ends....  Once the property was transferred, Pinnacle no longer had an insurable interest in the property and it ceased sustaining

1    any losses on the property for business interruption.  Thus,

2    the period of indemnity ended with the sale of the property.

3    Kaplan Decl., Ex. 11, p. 217-18.  These same issues are identified in RSUI's

4    stipulation of November 15, 2006, quoted at Section II.D, *supra*.

5    RSUI is the only carrier in Pinnacle's insurance program that has not satisfied

6    its liability in respect of Pinnacle's claim.  Goldberg Decl., ¶ 10.

7    ### III.   SUMMARY JUDGMENT STANDARD

8    Under Federal Rules of Civil Procedure, rules 56(a) and 56(d), a plaintiff may

9    move for partial summary judgment on a part of its claim, or on a defense, where

10   "material facts are not genuinely at issue."  Fed. R. Civ. P. 56(a), (d); *see, e.g., Mora*

11   *v. Chem-tronics, Inc.*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998) ("standards and

12   procedures for granting partial summary judgment, also known as summary

13   adjudication, are the same as those for summary judgment").  It is well-established

14   that, in the absence of conflicting extrinsic evidence, contract interpretation is a pure

15   question of law.  *See, e.g., Stanford Ranch v. Maryland Casualty Co.*, 89 F.3d 618,

16   624 (9th Cir. 1996).  Accordingly, partial summary judgment is appropriate on an

17   issue of contract interpretation where there are no material factual disputes.  *See, e.g.,*

18   *Pinnacle Entertainment, Inc. v. Allianz Global Risks US Insurance Co., et al.*, 2:06-

19   CV-00935-BES-PAL (Order of March 26, 2008) [Docket No. 190].  A partial

20   summary judgment serves the salutary "purpose of speeding up litigation by

21   eliminating before trial matters wherein there is no genuine issue of fact."  Advisory

22   Committee Notes (1946 Amendment).

23   ### IV.   GOVERNING LAW

24   There are two possibilities as to governing law in the present matter: Nevada

25   and Mississippi.  As there are no material differences between the two states' laws

26   with respect to the present dispute, the question of which law applies is academic.[5]

27

28   _____

[5] Both Nevada and Mississippi adhere to the ordinary rules of contract law as applied to insurance contacts.  *Compare Nevada VTN v. Gen. Ins. Co. of America,*

1     Were Nevada and Mississippi law dissimilar, the Primary Policy provides that

2   Nevada law would govern here:

3          All matters arising hereunder shall be determined in

4          accordance with the law and practice of such Court [where

5          suit is brought].

6   Kaplan Decl., Ex. 3, p. 102.

7     The reference to "[a]ll matters" confirms that this provision applies to the

8   substantive law of Nevada.  After all, this provision would be unnecessary if it only

9   referred to choice-of-law principles, since the court in which suit is brought always

10  applies the choice-of-law principles of the state in which it sits.  *Klaxton Co. v.*

11  *Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Abogados v. AT&T, Inc.*, 223 F.3d

12  932, 934 (9th Cir. 2000).  The rules of contract interpretation require that, if possible,

13  no provision of a contract be read as a nullity.  *Coblentz v. Hotel Employees &*

14  *Restaurant Employees Union Welfare Fund*, 112 Nev. 1161, 1169, 925 P.2d 496, 501

15  (1996).

16    Moreover, even absent this contractual provision, Nevada law would govern

17  here.  Where no effective choice of law has been made by parties to a contract of

18  insurance, Nevada applies the five factor test as set forth in the *Restatement (Second)*

19  *Conflict of Laws*, § 188(2).  *Sotirakis v. U.S.A.A.*, 106 Nev. 123, 125-26, 787 P.2d

20  788, 790-91 (1990).  These factors, which "revolve around the expectations of the

21  parties at the time of contracting," are: (a) the place of contracting, (b) the place of

_____

23  834 F.2d 770, 773 (9th Cir. 1987) (applying Nevada law) (unambiguous language is
24  construed according to its plain meaning and usage; the policy must be read as a
    whole to give a reasonable and harmonious meaning and effect to all its provisions;
25  ambiguous provisions are construed against the insurer and in favor of the insured);
26  *with Buente v. Allstate Ins. Co.*, 422 F.Supp.2d 690, 695 (S.D.Miss. 2006) (applying
    Mississippi law) (unambiguous terms are enforced as written; the policy must be read
27  as a whole with each provision given a reasonable interpretation consistent with the
28  other terms of the contract; ambiguous provisions are construed against the insurer
    and in favor of the insured).

negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. *Id.*, 106 Nev. at 126, 787 P.2d at 790; *see Restatement (Second) Conflict of Laws* § 188(2).

Pinnacle is based in Nevada, with its corporate headquarters in Las Vegas. Goldberg Decl., ¶ 2. The policies were marketed, negotiated, brokered, delivered, received, and are to be performed in Nevada. *Id.*, ¶ 11. Pinnacle obtained the policies through a broker based in Nevada, who serviced the policies in Nevada. *Id.* The broker billed Pinnacle in Nevada, and all premium payments were made from Pinnacle's Nevada offices. *Id.* While Casino Magic was located in Mississippi, the policies insured at least seven locations in five states, including Nevada. *Id.* Moreover, the policy provided that Casino Magic could be replaced anywhere in America. Kaplan Decl., Ex. 3, p. 80, § III.A. Pinnacle's financial interest in its business interruption coverage has no real connection to any state other than Nevada, which has a significant interest in the honoring of business interruption insurance contracts with its residents.

## V.  RELEVANT INSURANCE LAW

It is a well-settled principle of insurance law that an insurance policy's coverage clauses "are interpreted broadly so as to afford the greatest possible coverage to the insured." *National Union Fire Ins. Co. v. Reno's Executive Air, Inc.*, 100 Nev. 360, 365, 682 P.2d 1380, 1383 (1984) (per curiam) (*National Union v. Reno's*); *accord Nevada VTN v. Gen. Ins. Co.*, 834 F.2d 770, 774 (9th Cir. 1987). Moreover,

> [i]n determining the meaning of an insurance policy, the language should be examined from the viewpoint of one not trained in law or in the insurance business; the terms should be understood in their plain, ordinary and popular sense. In particular, an insurer wishing to restrict the

> coverage of a policy should employ language which
>
> clearly and distinctly communicates to the insured the
>
> nature of the limitation.

*National Union v. Reno's, supra,* 100 Nev. at 364, 682 P.2d at 1382 (citations omitted).  Thus, "[a]ny ambiguity or uncertainty in an insurance policy must be resolved against the insurer and in favor of the insured."  *Id*., 100 Nev. at 365, 682 P.2d at 1383.  Moreover, the policy should not be construed to defeat the purpose of the insurance it purportedly provides.  *Id*., 100 Nev. at 364, 682 P.2d at 1383 ("The contract will be given a construction which will fairly achieve its object of providing indemnity for the loss to which the insurance relates.").

## VI.   PINNACLE'S SALE OF THE CASINO MAGIC PROPERTY DOES NOT LIMIT ITS BUSINESS INTERRUPTION RECOVERY

"[T]he essential nature and purpose of business interruption insurance generally is to protect the earnings which the insured would have enjoyed had there been no interruption of the business."  *Northwestern States Portland Cem. Co. v. Hartford F.I. Co.*, 360 F.2d 531, 534 (8th Cir. 1966); *see* 4 Appleman, *Insurance Law and Practice* § 2329, at 324 (1969) ("Generally, the purpose of business interruption insurance is to protect the prospective earnings of the insured's business").

On November 9, 2006, Pinnacle sold certain assets related to its Casino Magic business to Harrah's.  Pinnacle did not sell the Casino Magic business; indeed, the sale agreement specifically provides that Pinnacle is "relocating [its] business operations to St. Louis, Missouri."  Kaplan Decl., Ex. 9, p. 145, Recital F.  Pinnacle expressly did not assign or otherwise transfer any of its policy rights or insurance claim for the loss it had sustained, and continued to sustain, due to Hurricane Katrina. *Id*., p. 162, § 6.7.1.

Although RSUI has stipulated that the St. Louis property is a replacement site for construction-cost purposes pursuant to Paragraph III.A of the Primary Policy, (*id*., Ex. 8, p. 132), it nevertheless contends that "once Pinnacle sold the Casino Magic

1  facilities to Harrah's ..., Pinnacle no longer had an insurable interest in the property

2  and the Period of Indemnity ended." *Id.*, Ex. 11, p. 218.  RSUI also argues that, even

3  if Pinnacle had an insurable interest after the sale of the Casino Magic property, the

4  Primary Policy provides that date of the Asset Sale is the last date on which Pinnacle

5  can recover for business interruption.  *Id.*, Ex. 8, p. 133-34, ¶ 5.  RSUI is in error.

6  **A.**     **The sale of the Casino Magic property did not terminate Pinnacle's**

7  **insurable interest.**

8         Nevada, as a matter of statutory law, requires that an insured have an insurable

9  interest ***at the time of the loss*** for the enforcement of a contract of insurance.

10  Nev.Rev.Stat. § 687B.060 ("No contract of insurance of property or of any interest in

11  property or arising from property shall be enforceable as to the insurance except for

12  the benefit of persons having an insurable interest in the things insured as at the time

13  of the loss."); *B A Properties, Inc. v. Aetna Casualty & Surety Co.*, 273 F.Supp.2d

14  673, 682 n.3 (D.V.I. 2003) (*B A Properties*) (citing Nev.Rev.Stat. § 687B.060).[6]  This

15  is the general rule throughout America whether or not there is a statute so providing.

16  *E.g.*, *Ebert v. Grain Dealers Mut. Ins. Co.*, 303 N.E.2d 693, 700 (Ind.App. 1973)

17  (insured's potential interest in post-loss operational income prevented summary

18  judgment against it); *DiLeo v. United States Fidelity & Guaranty Co.*, 248 N.E.2d

19  669, 675 (Ill.App. 1969) (finding insurable interest for purposes of business

20  interruption insurance based on the "definite prospect of business earnings and

21  continuance of a going business" at the time fire curtailed insured's operations at the

22  damaged site).  It is also the general rule that "[t]he rights of the parties to the

23

24

25

---

26         [6] Many states have similar statutes.  *See, e.g.*, Ala.Code § 27-14-4; Alaska Stat.
§ 21.42.030; Ark.Code Ann. § 23-79-104; Del.Code Ann. tit. 18 § 2706; Fla. Stat. ch.

27  627.405; Ga.Code Ann. § 33-24-4; Idaho Code § 41-1806; Ky.Rev.Stat. Ann.
§ 304.14-060; Me.Rev.Stat. Ann. tit. 24-A § 2406; Md.Code Ann. Ins. § 12-301;

28  Mont.Code Ann. § 33-15-205; N.M. Stat. Ann. § 59A-18-6.

1  insurance contract are determined as of the time or moment the loss is sustained."  12
2  *Couch on Ins.* § 178.66.[7]

3         RSUI ignores this well-settled rule, arguing that the insured no longer has an
4  insurable interest in connection with an existing claim should it sell its damaged
5  property.  But this is certainly not the law.  "Since the right to indemnity accrues as
6  of the time of the loss, the fact that insured thereafter parts with his or her interest or
7  assigns the policy does not defeat recovery."  3 *Couch on Ins.* § 41.15.  It is for this
8  reason that "the rights of the parties [with respect to business interruption coverage]
9  are determined as of the time of loss, and that any change in the insurable interest
10 after the time of loss does not affect the amount that the insured can recover under the
11 applicable insurance policy."  *B A Properties, supra*, 273 F.Supp.2d at 683.

12        Any other result would be unfair.  If an insured that owned the business at the
13 time it purchased the insurance and at the time of the loss determines not to rebuild
14 its enterprise destroyed by a catastrophe, it nevertheless has lost the profits that it
15 otherwise would have obtained but for the catastrophe.  Similarly, if that insured
16 determines not to rebuild its enterprise after a catastrophe and instead sells its
17 damaged business property, it undoubtedly does so at a price discounted by virtue of
18 the time and effort that a new owner would need to repair the damaged property and
19 establish a new business.  In other words, the insured's sale of the damaged property
20 is likely only to reap the value of the damaged property, and not the value that would

21 ────────────────
22        [7] *See, e.g., Rube v. Pacific Ins. Co. of N.Y.*, 131 So.2d 240, 243 (La.Ct.App.
   1961); *Travelers Ins. Co. v. Providence Washington Ins. Group*, 142 A.D.2d 968, 968
23 (N.Y.App.Div. 1988); *Home Ins. Co. of New York v. Dalis*, 141 S.E.2d 721, 724 (Va.
   1965); *Gossett v. Farmers Ins. Co. of Washington*, 948 P.2d 1264, 1271 (Wa. 1997).
24 There is no reason to believe that Mississippi would have a different rule.  "In
   Mississippi, the insurable interest doctrine has been developed primarily through the
25 common law."  Jackson, *Miss. Ins. Law and Prac.* § 4:1 (up. June 2008).  "The
   general rule [is] that anyone who derives a benefit from property or would suffer loss
26 from its destruction has an insurable interest in the property."  *Universal*
27 *Underwriters Group, Inc. v. State Farm Fire and Cas. Co.*, 931 So.2d 617, 620
   (Miss.App. 2005).
28

have been received had the insured sold an undamaged property and a going concern.

Thus, it is only fair that the subsequent sale of the property does not affect the

insurability of the loss.[8]

Further, the sale of the damaged Casino Magic property cannot possibly affect

the insurability of Pinnacle's business interruption loss because the Casino Magic

business itself was not sold.  The sale agreement explicitly recognized that Pinnacle

was "relocating [its] business operations to St. Louis, Missouri," and that, among

other things, Pinnacle retained ownership of its Casino Magic businesses, insurance

claims and policies, trademarks, and any potential or actual future revenues.  Kaplan

Decl., Ex. 9, p. 145 (Recital F), p. 156 (§ 5.4.2.6), p. 162 (§ 6.7.1), p. 162-63 (§ 6.8).

Since Pinnacle retained ownership of the Casino Magic business, the sale of the

underlying real estate cannot possibly operate to render its business interruption loss

uninsurable, or cap the loss as of the date of the Asset Sale.

**B.**  **The RSUI policy does not limit Pinnacle's business interruption insurance to the period prior to the Casino Magic Asset Sale.**

RSUI argues that, even if Pinnacle had an insurable interest with regard to

business interruption coverage after the Casino Magic Asset Sale, the Primary Policy

nevertheless precludes Pinnacle from recovering any subsequent business

interruption loss.  Kaplan Decl., Ex. 8, ¶ 5.  RSUI's argument seems to rely on the

undefined language in the Time Element Section of the Primary Policy referring to

"ACTUAL LOSS SUSTAINED."  *Id*., Ex. 3, p. 85, § I ("The policy provides the

following Time Element coverages and Time Element Conditions:  [¶]  RECOVERY

in the event of loss hereunder shall be the ACTUAL LOSS SUSTAINED ....").

Although "RECOVERY" and "ACTUAL LOSS SUSTAINED" appear in the

Primary Policy in all capitals, these terms are left undefined.  Notwithstanding the

---

[8] Of course, if the Biloxi property sustained another casualty loss after the Asset Sale by Pinnacle to Harrah's – *e.g.*, a hurricane striking Biloxi in 2008 – Pinnacle would have no insurable interest in the property to make a claim in connection with any damage caused by the 2008 hurricane.

general principals that "[a]ny ambiguity or uncertainty in an insurance policy must be resolved against the insurer," and that "an insurer wishing to restrict the coverage of a policy should employ language which clearly and distinctly communicates to the insured the nature of the limitation" (*National Union v. Reno's, supra*, 100 Nev. at 364, 365, 682 P.2d at 1382, 1383, citations omitted), RSUI apparently takes the position that Pinnacle's post-sale business interruption loss was not "actually" sustained because Pinnacle did not rebuild its damaged Casino Magic property in Biloxi, but rather sold it.  This is nonsense.

The "actual loss sustained" language in the Primary Policy is part of a standard provision included in most business interruption policies.  37 A.L.R. 5th 41, § 30 (supp. ed., originally published in 1996).  It is well-settled that this requirement is simply to prevent the insured from being placed in a better position than if no loss had occurred, for example, where the business was not previously profitable.  *See, e.g.*, *Georgia-Pacific Corp. v. Allianz Ins. Co.*, 977 F.2d 459, 463 (8th Cir. 1992) (*Georgia-Pacific*); *In re Cosmetics Plus Group, Ltd.,* 379 B.R. 464, 470 (Bkrtcy.S.D.N.Y. 2007).  Nevada law makes clear that the term "actual loss sustained" means that the policies at issue cover predictable net losses resulting from the interruption of business, based upon the historic performance of the business.  *See Arley v. Liberty Mut. Fire Ins. Co.*, 80 Nev. 5, 12-13, 388 P.2d 576 (1964) (trial court properly interpreted "actual loss sustained" in insurance policy covering loss of rental income as the probable net rental income).  In other words, the purpose of the term is to ensure recovery for objectively measurable – not speculative – losses.  Here, Pinnacle will not be placed in a better position than if Hurricane Katrina had not destroyed Casino Magic, because Pinnacle only seeks its objectively measurable net business interruption losses at Casino Magic (as evidenced by its historic business performance and probable experience thereafter).

In dealing with an identical insurer argument, issue (sale of property), and policy language, the court in *B A Properties* held in favor of the insured:

The term "actual loss sustained" does not mean that an actual loss must be experienced.  *Georgia-Pacific Corp. v. Allianz Ins. Co.*, 977 F.2d 459, 463 (8th Cir. 1992).  "A profitable business ... can prove it will fail to earn net profits because of the interruption based on the business's actual experience before the accident and the probable experience it would have had without the accident."  *Id.* ....  The Policy clearly states that the actual loss can be determined with "due consideration given to the experience of the business before the date of damage or destruction and to the probable experience thereafter had no loss occurred."  Thus, the "actual loss sustained" limitation means only that an actual loss must be predictable from past business experience.

*B A Properties, supra*, 273 F.Supp.2d at 683; *see also Georgia-Pacific*, *supra*, 977 F.2d at 463 ("A profitable business like [the insured's] ... can prove it will fail to earn net profits because of the interruption based on the business's 'actual experience … before the "accident" and the probable experience it would have had without the "accident."'").

It is for this reason that the courts have consistently recognized that the period of business interruption loss for which the insured may recover is "theoretical" in nature, and thus permits recovery even where the insured decides not to restore the damaged or destroyed property.  *See* 37 A.L.R.5th 41, § 48, *supra* (stating rule and collecting cases); 44 Am. Jur. 2d Insurance § 1534 (up. May 2008) (same); *e.g., Beautytuft, Inc. v. Factory Ins. Ass'n.*, 431 F.2d 1122, 1124-25 (6th Cir. 1970) (holding that insured was entitled to business interruption recovery for theoretical replacement time under policy language identical to the policies here); *B A Properties*, *supra*, 273 F.Supp.2d at 685 (there is no "require[ment] ... to rebuild or to

resume business operations to be compensated for [an insured's] business interruption loss."). This interpretation is consistent with the principle that business interruption loss is "determined as of the time or moment the loss is sustained." *See, e.g.*, 12 *Couch on Ins.* § 178.66; *see also* Section VI.A, *supra*.

If the policy here meant to vitiate this established understanding, it should have defined "Actual Loss Sustained" differently to so provide, and used language distinguishable from this standard provision with years of interpretative gloss under the case law. It did not. *See, e.g.,* Kaplan Decl., Ex. 3, p. 89, § VIII.C. Consequently, the sale of the real estate underlying Casino Magic and certain related assets did not terminate Pinnacle's ongoing business interruption loss nor the policy coverage.

## VII.   PINNACLE'S REPLACEMENT OF ITS CASINO MAGIC BUSINESS IN ST. LOUIS DOES NOT BAR RECOVERY OF START-UP COSTS

In addition to its unfounded argument that Casino Magic's Asset Sale limits RSUI's business interruption coverage to loss occurring prior to the date of sale, RSUI argues that its obligation to pay for Pinnacle's start-up costs is somehow separately terminated by the designation of St. Louis as a replacement site.[9] RSUI does not argue that start-up costs are not typically encompassed by its business interruption coverage. Nor could RSUI, as the insuring agreement broadly insures against loss resulting from "necessary interruption of business … caused by damage or destruction by the peril(s) insured against during the term of this policy to real and personal property." *See* Kaplan Decl., Ex. 3, p. 85. Nor does RSUI argue that Pinnacle would not have been entitled to its start-up costs had Biloxi reopened.

---

[9] Start-up costs are mostly composed of employee salaries for training and otherwise readying the facility for a successful opening, and marketing and advertising with respect to the opening. Kaplan Decl., Ex. 10, p. 215-16. Lesser start-up costs include taxes, licenses and insurance, legal fees, and travel and meals. *Id.* Start-up costs are identified in the claim that Pinnacle submitted to its insurers, including RSUI. *Id.*

1   Instead, RSUI argues that Pinnacle's contractual right to its start-up costs, as

2   measured by what those costs would have been at the Biloxi facility, are terminated

3   by the replacement of that facility with the St. Louis site.  *Id.*, Ex. 11, p. 217-18 ("The

4   following legal issues remain ….  Pinnacle did not incur any 'start-up' costs as it did

5   not repair, rebuild or replace Casino Magic….  Thus, Pinnacle did not incur any

6   'start-up' costs related to Casino Magic.").  RSUI advances this argument even

7   though,

8   - RSUI stipulated to that replacement, *when it served RSUI's interests*, for

9     purposes of the calculation of construction costs,

10  - Construction on the St. Louis facility did not begin until more than two

11    years after Hurricane Katrina, and

12  - Pinnacle has incurred or will incur greater start-up costs than those that

13    would have been incurred at Biloxi (but seeks only to recover such costs

14    as measured at Biloxi).

15  **A.**     **The Primary Policy provides the insured with the option of replacement.**

16       The Primary Policy "covers against the loss resulting only from necessary

17  interruption of business," and specifically allows the insured to replace its damaged

18  property by relocating anywhere else in the United States.  Kaplan Decl., Ex. 3, p. 80,

19  § III.A (providing that damaged property can be "repaired, rebuilt or replaced" at the

20  same or another site "within the same country"), p. 85, Time Element § I (insuring

21  agreement).[10]  This is in addition to the insured's right to stay put and rebuild or

22       [10] This result is consistent with general insurance law.  *See, e.g., Conway v.*

23  *Farmers Home Mut. Ins. Co.*, 31 Cal.Rptr.2d 883, 886 (Cal.App. 1994) (terms of fire

24  policy providing coverage for cost of replacement of building destroyed by fire did

25  not unambiguously limit that coverage to replacement on the same site; under

    dictionary definition the ordinary and popular meaning of "replace" includes the

26  purchase of a replacement dwelling at another location even though the damaged

27  home could have been rebuilt on the same site; interpreting policy as a whole "as

    contemplating, rather than eliminating, the possibility of replacement at another

28  premises"); *S & S Tobacco & Candy Co. v. Greater N.Y. Mut. Ins. Co.*, 617 A.2d

    1388, 1391 (Conn. 1992) (terms of fire policy providing coverage for cost of

1   repair the damaged property at the original site.  The expenses incurred in ramping up

2   the facility for opening are loss resulting from interruption, and would be

3   unnecessary except for the interruption.

4          In arguing that Pinnacle's designation of the St. Louis County project as a

5   replacement for the Biloxi property terminates coverage for start-up costs, RSUI

6   seeks to read terms and limitations into the Primary Policy that plainly are not there.

7   There is nothing in the Primary Policy to suggest that by exercising its option under

8   the policy to replace its damaged property elsewhere in the United States, the insured

9   terminates its right to otherwise recoverable costs.  Nor is there anything in the

10  Primary Policy to suggest any limitation with respect to the location within the

11  United States of the replacement, or whether the new site might have been in

12  consideration prior to the covered cause of loss.  Only by reading non-existent

13  language into the Primary Policy can such a result be imagined.

14  **B.     The designation of the St. Louis project as a replacement does not**

15          **terminate coverage for start-up costs.**

16         Although RSUI knew that Pinnacle was contemplating it, neither RSUI nor any

17  other insurer objected to replacing the Biloxi facility with one in the earliest planning

18  stages in St. Louis.  Indeed, on November 15, 2006, six days after the Asset Sale at

19  Biloxi, RSUI stipulated that the contemplated St. Louis facility was a replacement for

20  Pinnacle's destroyed Biloxi property for the purpose of calculating construction

21  costs.  But having provided in its policy that the insured may replace its damaged

22  facility elsewhere, and having agreed that St. Louis was the replacement location for

23  construction-cost purposes, RSUI seeks to impose a penalty on Pinnacle – the

24  replacement of building destroyed by fire did not unambiguously limit that coverage

25  to replacement on the same site, and policy would be construed against insurer to
    provide coverage for a replacement at a different location); *Blanchette v. York. Mut.*

26  *Ins. Co.*, 455 A.2d 426, 427-28 (Me. 1983) (express terms of fire policy providing

27  coverage for cost of replacement building destroyed by fire refute argument that
    replacement structure be repaired or replaced on the same premises "and no rule of

28  construction supports such a reading of the contract").

1  termination of Pinnacle's right to otherwise covered start-up costs – after it exercised

2  its replacement option.  RSUI thus seeks a windfall for Pinnacle's unobjected to

3  exercise of its contractual right.

4       Ignoring the principle that "an insurer wishing to restrict the coverage ...

5  should employ language which clearly and distinctly communicates to the insured the

6  nature of the limitation" (*National Union v. Reno's, supra*, 100 Nev. at 365, 682 P.2d

7  at 1382), RSUI seems to argue that its newly imposed restriction is justified by the

8  fact that initial planning for the St. Louis location pre-dated Hurricane Katrina, and

9  thus that start-up costs would have been incurred at St. Louis even had the Biloxi

10  facility not been destroyed.

11       There is no basis in law or logic preventing an insured from choosing to

12  replace a destroyed property with a facility that is within the insured's contemplation

13  at the time of the loss.  Nor does any policy language justify that result.  The Primary

14  Policy gives the insured the right to "repair, rebuild or replace."  RSUI concedes that

15  had Pinnacle "repair[ed]" or "rebuil[t]" its Biloxi facility, it would be entitled to time

16  element coverage of its start-up expenses.  No policy language indicates that

17  "replace[ment]" is of lesser value, or provides for different coverage, than repairing

18  or rebuilding.

19       That Pinnacle regarded St. Louis as a desirable location for a future hotel and

20  casino before Hurricane Katrina struck Casino Magic – although concrete plans were

21  not yet drawn up and even the start of construction was more than two years away –

22  is irrelevant.  In connection with the opening of the St. Louis facility, start-up costs

23  must be incurred.  Once Pinnacle designated the St. Louis facility as the replacement

24  for Biloxi – and especially after RSUI stipulated to this – the costs that would have

25  been incurred restarting Biloxi, to the extent that they will be incurred at St. Louis,

26  are compensable.  Otherwise, the St. Louis site is not "replacing" Biloxi.

27       Were RSUI correct, there would be a partial decouplement of the coverage

28  provided by the Property Damage Section and the Time Element Section.  According

to RSUI, on the one hand, the Property Damage Section permits "replacement" without regard to where in America that occurs or what the status of construction is (after all, RSUI stipulated to St. Louis as a replacement site for construction-cost purposes), but on the other hand, the Time Element Section does not permit "replacement" at all.  Such a non-intuitive result requires explicit language, and warning, in the policy, that is obviously lacking here.

**C.**     **Pinnacle's start-up costs would be recoverable even if Biloxi had been closed and not replaced.**

Although the replacement in St. Louis compels coverage for start-up expenses (as measured at Biloxi), it is to be noted that, under the Primary Policy, the Biloxi start-up expenses would be recoverable even if Biloxi had been shut down with no replacement in St. Louis or anywhere else.

*DiLeo v. United States Fidelity & Guaranty Co.*, 248 N.E.2d 269 (Ill.App. 1969) (*DiLeo*), interprets a policy that is in all material respects identical to the present one, and confirms this conclusion.  In *DiLeo*, a fire destroyed the insured's premises.  Although the insured choose not to restart its business, it sought "theoretical" payroll expenses that it would have incurred had the business been restarted.  The court held that the policy language contemplated the recovery of payroll expenses, although never incurred, necessary to resume normal operations.  The court reasoned that "the policy form in question contemplates restoration of the business and it is for that, that the premium for the policy was paid."  *DiLeo, supra,* 248 N.E.2d at 675.

> The form states that "due consideration shall be given to the continuation of normal charges and expenses, including payroll expense *to the extent necessary to resume operations of the Insured with the same quality of service which existed immediately preceding the loss.*"
>
> [The insured points out, and the court agrees] that *there is*

1  *nothing in the provision that requires that the salaries*

2  *actually be paid – only that they be normal charges and*

3  *expenses as are necessary to adequate resumption of the*

4  *assureds' operations.*

5  *Id.* (italics added); *see* Kaplan Decl., Ex. 3, p. 85, § I, p. 89, § VIII.C.  It is because

6  the insured has paid the premium in contemplation of the restoration of the business

7  that reimbursement of start-up expenses, whether or not they are eventually incurred,

8  is required.  "The fact that the payroll expenses are entirely theoretical should not

9  impede recovery of them."  *DiLeo*, *supra*, 248 N.E.2d at 676.

10  Advertising expense, legal fees, and similar start-up costs are identical to the

11  payroll expenses analyzed in *DiLeo.*  Each are "normal" expenses necessary to

12  restore "[t]he condition that would have existed had no loss occurred."  *Id.,* 248

13  N.E.2d at 676; Kaplan Decl., Ex. 3, p. 106 (as in *DiLeo*, defining "Normal" as "[t]he

14  condition that would have existed had no loss occurred").  "The fact that the insured

15  decides not to resume business does not change the nature of the expense even

16  though it will probably make his proof more difficult."  *DiLeo, supra,* 248 N.E.2d at

17  676.

18  Because the policies here, like the one in *DiLeo*, contemplate that the insured

19  will recover start-up costs, those costs, even though theoretical and even if never

20  actually incurred, are recoverable.  Thus, even if Pinnacle had not designated St.

21  Louis as a replacement facility (as it did), and even if RSUI had not stipulated to St.

22  Louis as the replacement facility for construction-cost purposes pursuant to

23  Paragraph III.A of the Primary Policy (as it did), the theoretical start-up expenses at

24  Biloxi would nevertheless be recoverable.

25

26

27

28

## VIII. CONCLUSION

For the reasons set forth here, (1) the sale of Pinnacle's decimated Casino Magic building and associated real estate in Biloxi has no effect on Pinnacle's insurable interest and no effect on the period of loss, and (2) the replacement of the Casino Magic facility in St. Louis has no effect on RSUI's liability to Pinnacle for start-up costs measured at Biloxi.  Pinnacle is therefore entitled to partial summary judgment on these two issues.

Dated:  October 20, 2008

Respectfully submitted,

Irell & Manella LLP
Marc S. Maister
Harry J. Schulz, III
David R. Kaplan

By: _____

Marc S. Maister
(Admitted *pro hac vice*)
Attorneys for Plaintiff
Pinnacle Entertainment, Inc.

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on the 20th day of October, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Andrew P. Gordon (agordon@mcdonaldcarano.com)
McDonald Carano Wilson LLP
2300 W Sahara Avenue
Suite 1000-10
Las Vegas, NV 89102

Andrew C. Jacobson (ajacobson@clausen.com)
Courtney E. Murphy (cmurphy@clausen.com)
Clausen Miller PC
One Chase Manhattan Plaza
New York, NY 10005

Keith F. Butler (kbutler@clausen.com)
Bryan A. McBurney (bmcburney@clausen.com)
Clausen Miller, PC
2040 Main Street
Irvine, CA 92614

*Attorneys for Defendant*
*RSUI Indemnity Company*

*/s/ David R. Kaplan*
David R. Kaplan
Irell & Manella LLP
840 Newport Center Drive, Suite 400
Newport Beach, California 92660-6324
Telephone:  (949) 760-0991
Facsimile:  (310) 203-7199

Brownstein Hyatt Farber Schreck LLP
300 South Fourth Street, Suite 1200
Las Vegas, Nevada  89101
Telephone:  (702) 382-2101

*Attorneys for Plaintiff*
*Pinnacle Entertainment, Inc.*

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional  Corporations